**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-18-01795-TUC-JGZ (BGM) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Emmanuel James Philip Eaton, | |
| Defendant. | |

Currently pending before the Court is Defendant Emmanuel James Philip Eaton's Motion to Suppress Evidence (Doc. 14). The Government has filed its response, and there was no reply. Govt.'s Response to Def.'s Mot. to Suppress (Doc. 17). Defendant is charged with one (1) count of possession of an unregistered firearm in violation of Title 26, United States Code, Sections 5845(a), 5861(d), and 5871. Indictment (Doc. 1) at 1.

Pursuant to LRCrim. 5.1, this matter came before Magistrate Judge Macdonald for an evidentiary hearing and a report and recommendation. On March 7, 2019, an evidentiary hearing was held before Magistrate Judge Macdonald regarding the motion. Minute Entry 2/27/2019 (Doc. 88). Subsequently, Defendant filed his Supplemental Authorities in Support of Motion to Suppress Involuntary Statement (Doc. 96) and the Government filed its Response (Doc. 97). This matter is now ripe for adjudication. The Magistrate Judge recommends that the District Court, after its independent review, deny Defendant's motion.

I. **FACTUAL BACKGROUND**

On May 26, 2018, United States Forest Service ("USFS") Office of Law Enforcement and Investigations Law Enforcement Officer Mark Sanburn was assigned to the Coronado National Forest Santa Catalina Ranger District. Hr'g Tr. 3/7/2019 (Doc. 31) at 5:6–6:20. Officer Sanburn has been employed with the USFS Office of Law Enforcement and Investigations since 2010—approximately nine (9) years, and a commissioned law enforcement officer since 2001. *Id.* at 5:17–18, 16:6–14, 63:1–5. Officer Sanburn testified that his job entails protecting the public and resources on the forest through the enforcement of the Code of Federal Regulations and other laws that govern the National Forest System lands. *Id.* at 5:19–6:8, 64:16–65:1, 108:24–110:3. Officer Sanburn further testified that as part of his responsibilities he works in connection with fire prevention personnel. *Id.* at 6:21–24.

Defendant James Philip Eaton was twenty-one (21) years old at all relevant times. *Id.* at 124:3–6, 18–22. Prior to this encounter, Mr. Eaton had not been in any legal trouble. Hr'g Tr. 3/7/2019 (Doc. 31) at 127:8–13. Mr. Eaton testified that he and his girlfriend's cousin, Jose Castro, arrived on Mount Lemmon between 5:00 and 5:30 p.m. on May 26, 2018. *Id.* at 129:7–9. Mr. Eaton further testified that he and Mr. Castro set up a tent, and Jose lit a fire because it was cold. *Id.* at 129:10–22.

*A. USFS Initial Contact*

On May 26, 2018, the Coronado National Forest was under fire restrictions. Hr'g Tr. 3/7/2019 (Doc. 31) at 7:3–15. Officer Sanburn testified that there was a specific fire closure order in place. *Id.* Officer Sanburn explained that these orders are a temporary regulation or law that prohibits certain activities due to the assessment made by the fire division within the USFS. *Id.* Officer Sanburn noted ban examples including no campfires, no smoking out in the open, and a ban on certain combustible engines. *Id.* Officer Sanburn further testified that during the relevant fire closure order one of the main focuses was campfires on the forest. *Id.* Officer Sanburn explained that when such closure orders are in effect, signs are posted all over the forest. Hr'g Tr. 3/7/2019 (Doc.

31) at 8:13–9:9.

Officer Sanburn testified that he was notified via service radio that USFS Forest Protection Officers made contact with the party at the camp in this case because they had an illegal campfire. *Id.* at 7:16–8:7. Officer Sanburn explained that USFS Forest Protection Officers are Forest Service employees that have a collateral duty to enforce certain regulations, can give written warnings and tickets, and patrol for illegal campfires. *Id.* at 7:16–8:7, 108:5–23. Officer Sanburn testified that the Forest Protection Officers talked to the individuals at the camp and notified them that they were there to put the fire out. *Id.* Mr. Eaton confirmed that a park ranger instructed them to put the fire out because of the fire restrictions. *Id.* at 129:23–130:3. Officer Sanburn further testified that he was notified via service radio again that other USFS or Mount Lemmon Fire District personnel observed another campfire at the same camp, and asked Officer Sanburn for assistance at the site. Hr'g Tr. 3/7/2019 (Doc. 31) at 7:16–8:7, 108:5–23. Mr. Eaton also confirmed that Jose lit a second fire despite the initial warning. *Id.* at 130:4–14, 144:17–22. Officer Sanburn confirmed that signs were posted regarding the ban leading into the Mount Bigelow area where the incident occurred. *Id.* at 8:13–9:9, 72:25–73:2. Officer Sanburn testified that in the instant case, the individuals did not seem understand the information that the non-law enforcement personnel had given them regarding the closure order, and this led the personnel to seek intervention from someone with more authority. *Id.* at 8:13–9:9. Accordingly, Officer Sanburn responded to the campsite. *Id.* at 9:10–11, 62:18–25.

### B.     *Law Enforcement Contact*

Officer Sanburn testified that he arrived at the campsite at approximately 9:15 p.m., and the Mount Lemmon Fire Department volunteers told him that they had extinguished the fire shortly before his arrival. Hr'g Tr. 3/7/2019 (Doc. 31) at 9:12–16, 12:2–5, 67:21–68:1, 72:23–24. Officer Sanburn further testified that he talked to the volunteers and received additional information from the Forest Protection Officers, including confirmation that the two individuals that were at the campsite were the ones

who were tending the fires. *Id.* at 9:17–10:6. Officer Sanburn explained that because there had been two violations already, he felt it necessary to go and talk to the individuals to educate them on the closure order and insure that there was not a third fire. *Id.* at 9:17–10:6, 69:2–22. Officer Sanburn also noted the importance of understanding that campfires at that time of the year are often the cause of wildfires. *Id.* at 9:17–10:6, 110:20–24. Officer Sanburn further explained that fires must be completely extinguished to prevent embers from starting a forest fire. *Id.* at 10:7–11:9, 68:4–17, 110:14–19.

Officer Sanburn testified that once he arrived on scene, he spoke with the Mount Lemmon Fire Department volunteers that were there. Hr'g Tr. 3/7/2019 (Doc. 31) at 11:10–20. Officer Sanburn further testified that he positioned his vehicle toward the campsite, with his high beam headlights on so that he could see. *Id.* at 11:10–20. Officer Sanburn testified that he got out of his vehicle, and the two individuals at the campsite began walking toward him, one individual entered and then exited an SUV that was parked somewhat blocking the campsite, and Officer Sanburn made contact with the individuals near the SUV. *Id.* Officer Sanburn further testified that he was wearing his uniform and was in a marked law enforcement vehicle. *Id.* at 11:10–12:1. Mr. Eaton confirmed that it was Officer Sanburn arrived in a marked police vehicle and spoke to him about the campfire. *Id.* at 131:3–15. Officer Sanburn also testified that the two individuals' last names were Eaton and Castro, and he identified Mr. Eaton as the Defendant present in the courtroom. Hr'g Tr. 3/7/2019 (Doc. 31) at 12:9–13:5.

Officer Sanburn testified that it was dark at the time of the incident, and he used a flashlight to better see the individuals. *Id.* at 12:6–8, 13:7–22, 74:20–22. Officer Sanburn further testified that once he was able to observe Mr. Eaton, Officer Sanburn saw to large Bowie knives in sheaths on Mr. Eaton's side, as well as the clip of a pocketknife in his right pants pocket. *Id.* at 13:16–22, 14:11–14, 71:14–17, 73:20–25, 111:9–13. Mr. Eaton confirmed that he had the knives that Officer Sanburn described. *Id.* at 131:16–21. Officer Sanburn testified that in light of this safety concern, he called out and said that he saw Mr. Eaton's knives and that Mr. Eaton should not reach for them

- 4 -

and to keep his hands out of his pockets. *Id.* at 13:23–14:5. Officer Sanburn further testified that despite this instruction, Mr. Eaton twice placed his hands inside his pockets. Hr'g Tr. 3/7/2019 (Doc. 31) at 14:6–8. Mr. Eaton confirmed that Officer Sanburn instructed him to keep his hands out of his pockets, but did so despite this instruction because he was cold. *Id.* at 132:8–21. Officer Sanburn testified that he identified himself as law enforcement with the USFS and that he was there about some illegal fires. *Id.* at 14:15–15:2. Officer Sanburn further testified that while he was attempting to educate the two individuals on the closure order and discern whether they were responsible for the earlier campfires, Mr. Eaton began advancing on him. *Id.* at 15:7–15. Mr. Eaton testified that he did not really step toward Officer Sanburn, but may have stumbled toward him. *Id.* at 132:24–133:4. Officer Sanburn testified that Mr. Eaton's failure to follow instructions including putting his hands in his pockets and advancing, made Officer Sanburn feel threatened. Hr'g Tr. 3/7/2019 (Doc. 31) at 15:7–15, 74:23–75:3, 112:6–113:1. Officer Sanburn further testified that he ordered Mr. Eaton to stop and turn around. *Id.* Officer Sanburn also testified that he proceeded to handcuff Mr. Eaton, removed the knives from his sides, and went to remove the pocketknife. *Id.* at 15:7–16:5, 75:7–12, 76:9–13. Mr. Eaton confirmed Officer Sanburn's actions. *Id.* at 133:5–15.

Officer Sanburn testified that when he went to remove Mr. Eaton's pocketknife, he felt a small marijuana pipe in the small coin pocket of the same pocket. *Id.* at 15:19–16:5, 76:14–16. Officer Sanburn further testified that when he removed the pipe, the smell of marijuana became more pungent and noticed what he believed to be burned marijuana residue inside the bowl of the pipe. Hr'g Tr. 3/7/2019 (Doc. 31) at 16:15–22. Officer Sanburn testified that at this point he asked Mr. Eaton to have a seat on the ground; however, Mr. Eaton declined and Officer Sanburn escorted him back to Officer Sanburn's patrol vehicle and requested that he sit in the back. *Id.* at 16:23–17:2. Mr. Eaton testified that he did not want to sit on the ground because it was cold and full of bugs. *Id.* at 133:16–23. Officer Sanburn further testified that he explained to Mr. Eaton

that he was not under arrest and that he was simply being detained. *Id.* at 17:3–6.

Officer Sanburn testified that he then obtained Mr. Castro's identification, determined that he was the owner of the SUV, and asked permission to look inside. *Id.* at 17:7–18:11, 80:1–11. Officer Sanburn further testified that he looked inside the SUV where Mr. Castro had entered upon Officer Sanburn's arrival, but did not see anything illegal. Hr'g Tr. 3/7/2019 (Doc. 31) at 17:7–18:11, 80:1–11. Officer Sanburn spoke with Mr. Castro about what they were doing and Mr. Castro said that he had left the remnant of a marijuana cigarette in the bark of a tree near the campsite. *Id.* at 17:16–18:11, 78:25–79:3, 80:12–15, 81:22–82:2. Mr. Castro showed Officer Sanburn where the remnant was, and Officer Sanburn took possession of it. *Id.* at 17:16–18:11, 18:19–21. Officer Sanburn testified that as he was walking to the tree, he walked past the tent and smelled a very strong odor of marijuana coming from inside the tent. *Id.* at 18:12–18, 81:5–21.

Officer Sanburn testified that he then asked Mr. Eaton for his identification, which he indicated was inside his wallet in a pocket inside the tent, next to a pistol-style BB gun. *Id.* at 17:7–19:7, 83:12–17. Officer Sanburn further testified that he asked Mr. Eaton for permission to go into the tent to get his identification, and Mr. Eaton said it was okay. Hr'g Tr. 3/7/2019 (Doc. 31) at 19:8–15, 84:25–85:3. Officer Sanburn testified that he walked to the tent, went inside with his flashlight illuminated, and began to look in the tent pockets for Mr. Eaton's wallet. *Id.* at 20:12–24. Officer Sanburn further testified that as he was looking for Mr. Eaton's wallet, he found a glass mason jar, partially covered by a sleeping bag or blanket, containing what he believed to be bud marijuana. *Id.* at 21:6–16, 87:1–88:10. Mr. Eaton confirmed that the jar of marijuana was in the corner of the tent, partially covered by blankets. *Id.* at 136:19–137:4. Officer Sanburn also testified that he found Mr. Eaton's wallet, took out Mr. Eaton's state identification, and returned the wallet to the tent pocket. *Id.* at 21:19–22:6. Officer Sanburn testified that upon obtaining Mr. Eaton's identification, he exited the tent, returned to his vehicle, and initiated wants and warrants checks on both Mr. Eaton and Mr. Castro. Hr'g Tr.

3/7/2019 (Doc. 31) at 22:11–23:8, 41:12–22, 89:20–22. At this point, Officer Sanburn turned on his dashboard camera, which he explained activates automatically when the forward-facing emergency lights are on; however, because Officer Sanburn believed this call to be a mundane illegal campfire call, his emergency lights were never activated and the dash camera had to be manually activated. *Id.* at 39:23–41:22. Officer Sanburn further testified that he spoke with Mr. Castro regarding the marijuana blunt and asked if he knew of any other marijuana in the campsite. *Id.* at 22:24–23:8. Officer Sanburn also testified that Mr. Castro initially denied other marijuana on the campsite, but then confirmed that there was marijuana inside the tent which was owned by Mr. Eaton. *Id.* at 22:24–23:10.

Officer Sanburn testified that at this point he realized that this was more than a campfire violation, so when he returned to Mr. Eaton, he advised him of his *Miranda*[1] rights and asked if Mr. Eaton was willing to talk with him without a lawyer present. *Id.* at 23:15–23, 90:3–91:6, 116:8–13. Officer Sanburn further testified that Mr. Eaton indicated that he understood his rights, and indicated, without hesitation, that he would speak to Officer Sanburn. Hr'g Tr. 3/7/2019 (Doc. 31) at 23:15–23, 48:24–49:8. Mr. Eaton testified that Officer Sanburn asked him about marijuana in the tent prior to asking for his identification, and before giving him Miranda warnings. *Id.* at 134:23–135:13. Officer Sanburn testified that he asked Mr. Eaton if there was any marijuana inside the tent, and Mr. Eaton ultimately admitted that there was a baggie of marijuana, and later said that there was a glass jar of marijuana.[2] *Id.* at 24:9–15, 98:6–9. At that point, Officer Sanburn had not seen a baggie of marijuana. *Id.* at 24:16–22. Mr. Eaton testified that although he mentioned a baggie of marijuana in the tent, he later changed his

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966).

[2] Defense counsel relied on a transcript of the video tape to suggest that Mr. Eaton stated that his girlfriend had the baggie of weed; however, Officer Sanburn testified that whatever Mr. Eaton had said about his girlfriend was unintelligible to him both at the time and on the video. *See* Hr'g Tr. 3/7/2019 (Doc. 31) at 92:21–96:3. The Court also notes that "federally certified transcribers" do not exist, except to the extent that a court reporter may be considered such. *See id.* at 92:21–96:1. The transcription merely contains a certification that it is true and accurate.

statement to the baggie being with his girlfriend. *Id.* at 139:9–22. Officer Sanburn further testified that he asked Mr. Eaton if he could retrieve the marijuana, and Mr. Eaton responded affirmatively. Hr'g Tr. 3/7/2019 (Doc. 31) at 24:23–25:15, 99:16–100:1. Mr. Eaton testified that he did not feel like he could say "no" to Officer Sanburn, since the latter had already seen the marijuana. *Id.* at 138:4–25. Mr. Eaton further testified that he only consented to Officer Sanburn retrieving the jar of marijuana, but admitted that he did not specify what marijuana could be retrieved. *Id.* at 140:15–142:9, 148:24–150:10. Mr. Eaton also acknowledged that Officer Sanburn had indicated that he was not going to take Mr. Eaton anywhere, and that Officer Sanburn had stated that he just wanted to give Mr. Eaton a ticket and go. *Id.* at 153:15–154:7, 156:21–157:4. Officer Sanburn testified that he walked back to the campsite and reentered the tent with his flashlight illuminated, found the jar of marijuana and looked for the plastic bag of marijuana that Mr. Eaton had indicated was in the tent. *Id.* at 25:16–26:12, 50:21–51:24, 100:18–101:2. Officer Sanburn further testified that as he scanned the tent looking for the bag of marijuana, he saw an open blue duffel bag and saw two firearms inside, one of which was a short-barreled shotgun. Hr'g Tr. 3/7/2019 (Doc. 31) at 25:16–26:12, 27:18–28:10. Mr. Eaton testified that the blue duffel bag was under the blankets, because he had put it "out of sight" since the fire marshals kept showing up and his and Mr. Castro's children were on the way up. *Id.* at 137:5–20. Officer Sanburn testified that he did not see marijuana inside the duffel bag, but found the bag of marijuana nearby further under blankets or a sleeping bag. *Id.* at 25:16–26:12, 57:23–58:8, 58:23–59:1. Officer Sanburn retrieved the bag, as well as the jar, of marijuana and also removed the duffel bag containing the firearms. *Id.* at 25:16–26:12, 27:18–28:20, 56:23–25, 61:24–62:3, 103:9–12. After finding these items, Officer Sanburn returned to talk to Mr. Eaton, who admitted ownership of the duffel bag and the short-barreled shotgun inside of it. *Id.* at 37:25–36:5. Officer Sanburn further testified that it was around this time that the microphone pack associated with the dashboard camera buzzed indicating that its battery was failing, so he turned on his body camera. Hr'g Tr. 3/7/2019 (Doc. 31) at 41:23–43:6, 103:21–104:1.

## II. ANALYSIS

Defendant seeks suppression in this case, asserting that the firearm was seized as the result of a pretextual, unlawful, and extended detention. *See* Def.'s Mot. to Suppress (Doc. 14) at 5–9. Defendant further asserts that his consent was involuntary. *Id.* at 9–12. Alternatively, Defendant asserts that even if his consent was voluntary, Officer Sanburn exceeded the scope of that consent. *Id.* at 12–14.

### A. Fourth Amendment–In General

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). For the police to conduct a valid stop, they must "have a reasonable suspicion supported by articulable facts that criminal activity may be afoot." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (internal quotes and citation omitted). "[T]he level of suspicion required for a *Terry* stop[, however,] is obviously less demanding than that for probable cause." *Id.* at 8, 109 S.Ct. at 1585 (internal citations omitted). "[W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." *Terry v. Ohio*, 391 U.S. 1, 30, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889 (1968).

"Reasonable suspicion is defined as 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (quoting *United States v. Cotterman*, 709 F.3d 952, 968 (9th Cir. 2013) (en banc)). "The reasonable-suspicion standard is not a particularly high threshold to reach." *Id.* Furthermore, although "a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id.* (quoting *Arvizu*, 534 U.S. at 274, 122 S.Ct. 744) (citations and internal quotation marks omitted).

When making a reasonable-suspicion determination, the reviewing court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002) (citations omitted); *see also United States. v. Alvarez*, 899 F.2d 833, 836 (9th Cir. 1990). In so doing, officers are allowed "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.* at 273, 122 S.Ct. at 750-51. (citations omitted); *see also Valdes-Vega*, 738 F.3d at 1078. Moreover, what may seem to be innocuous conduct when viewed in isolation may be appropriately considered when considering the totality of the circumstances; thus, it is inappropriate to view factors in isolation and to give no weight to factors which may have an innocent explanation. *Arvizu*, 534 U.S. at 273-75, 122 S.Ct. at 750-51; *see also Cotterman*, 709 F.3d at 970 ("It is not our province to nitpick the factors in isolation but instead to view them in the totality of the circumstances."). Furthermore, "A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *Valdes-Vega*, 738 F.3d at 1078-79 (citing *Arvizu*, 534 at 277, 122 S.Ct. 744) (alterations in original).

. . .

### B. Authority to Initiate Stop

Defendant argues that because Officer Sanburn came to the campsite to investigate an illegal campfire, and the fire had been extinguished prior to his arrival, the stop should have been brief and limited to a lecture of proper fire safety. Def.'s Mot. to Dismiss (Doc. 14) at 5. The Government counters that because officers had already had that discussion with Defendant and Castro earlier that same evening, additional measures to prevent Defendant's criminal conduct from occurring. Govt.'s Response (Doc. 17) at 6 (citing *United States v. Basher*, 629 F.3d 1161 (9th Cir. 2011)).

Officer Sanburn possessed the requisite reasonable-suspicion—his receipt of reports of a second illegal fire at Defendants' campsite provides "a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002) (citations omitted). Although the fire had been extinguished by the time Officer Sanburn arrived at the campsite, "it was reasonable [for him] to believe that the activities would occur [again]." *Basher*, 629 F.3d at 1165–66 (officers could reasonably assume that the use of an illegal campfire during a burn ban would resume in the near future). Officer Sanburn testified that USFS Forest Protection Officers had spoken with Mr. Eaton and Mr. Castro about illegal fires earlier in the evening, and sought his intervention after observing a second fire. Hr'g Tr. 3/7/2019 (Doc. 31) at 7:16–8:7, 108:5–23. It was this second fire that was extinguished at the time of Officer Sanburn's arrival at the campsite. *Id.* at 9:12–16, 12:2–5, 67:21–68:1, 72:23–24. As such, the initial stop of Defendant was proper under *Terry*. *United States v. Sokolow*, 490 U.S. 1, 7–8, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989).

### C. Pat-Down Search of Defendant

Officer Sanburn had a reasonable suspicion that criminal activity was afoot when he initially approached Mr. Eaton and Mr. Castro, and "in the course of investigating this behavior he identif[ied] himself as a policeman and ma[de] reasonable inquiries, and . . . nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to

conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." *Terry v. Ohio*, 391 U.S. 1, 30, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889 (1968). Officer Sanburn observed two large bowie knives and a pocketknife on Mr. Eaton's person and directed Defendant to keep his hands out of his pockets. Hr'g Tr. 3/7/2019 (Doc. 31) at 13:16–14:5, 14:11–14, 71:14–17, 73:20–25, 111:9–13, 131:16–21. Despite this direction, Mr. Eaton put his hands in his pockets and advanced on Officer Sanburn. *Id.* at 14:6–8, 15:7–15. Officer Sanburn appropriately conducted a brief pat-down search of Defendant, removing the bowie knives and discovering the marijuana pipe in the process of removing the pocketknife. *Minnesota v. Dickerson*, 508 U.S. 366, 375–76, 113 S.Ct. 2130, 2137, 124 L.Ed.2d 334 (1993) ("If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context.").

### D. Prolonging stop of Defendant

Defendant argues that his detention and the extension thereof was impermissible under *Rodriguez*.[3] The Government asserts that this "overlooks the fact that while Officer Sanburn initially responded to the defendant's campsite to investigate the campfire, once at the site he observed evidence of additional offenses that required his investigation and warranted extension of the initial encounter." Govt.'s Response (Doc. 17) at 6.

The Supreme Court of the United States in *Rodriguez* noted that "[l]ike a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop . . . and attend to related safety concerns." *Rodriguez*, 135 S.Ct. at 1614. The Court further noted that "[a]n officer . . . may conduct certain unrelated checks during an otherwise lawful

---

[3] *Rodriguez v. United States*, — U.S. —, 135 S.Ct. 1609, 191 L.Ed.2d 492 (2015).

traffic stop[,] [b]ut . . . he may not do so in a way that prolongs the stop absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 1615. Upon finding the marijuana pipe, Officer Sanburn developed a reasonable suspicion that criminal behavior regarding marijuana use occurred, which is a valid reason to prolong a lawful stop. *See United States v. Landeros*, 913 F.3d 862, 867 (presuming that "Officer Baker was permitted to prolong the initially lawful stop to ask the two women for identification, because he had reasonable suspicion they were underage."). Additionally, Officer Sanburn smelled marijuana emanating from the tent when he went to retrieve Mr. Castro's marijuana cigarette remnant from a tree. Hr'g Tr. 3/7/2019 (Doc. 31) at 17:16–18:21, 81:5–21. The Court finds that Officer Sanburn did not inappropriately prolong the stop.

### *E. Detention of Defendant*

"The whole point of an investigatory stop, as the name suggests, is to allow police to *investigate*[.] *Gallegos v. City of Los Angeles*, 308 F.3d 987, 991 (9th Cir. 2002) (emphasis in original). "There is no bright line rule for determining when an investigatory stop crosses the line and becomes an arrest." *Id.* (quotations and citations omitted). "[W]hether a police detention is an arrest or an investigatory stop is a fact-specific inquiry." *Id.* (quotations and citations omitted). Notably, "there is no per se rule that detention in a patrol car constitutes an arrest." *United States v. Parr*, 843 F.2d 1228, 1230 (9th Cir. 1988).

Here, Defendant was handcuffed and placed in Officer Sanburn's patrol car, because he refused to sit on the ground while Officer Sanburn continued his investigation. Hr'g Tr. 3/7/2019 (Doc. 31) at 16:23–17:2, 133:16–23. Moreover, Officer Sanburn testified that he handcuffed Mr. Eaton because of his failure to comply with directions including not putting his hands in his pockets when he had knives on his person and in a pocket. *Id.* at 13:16–14:14, 15:7–15, 71:14–17, 73:20–25, 74:23–75:3, 111:9–13, 112:6–113:1. Officer Sanburn also testified that he explained to Mr. Eaton that he was not under arrest and was simply being detained. *Id.* at 17:3–6. The Court

finds Officer Sanburn's testimony throughout to be credible. Additionally, Mr. Eaton acknowledged that Officer Sanburn had indicated that he was not going to take Mr. Eaton anywhere, and that Officer Sanburn had stated that he just wanted to give Mr. Eaton a ticket and go. *Id.* at 153:15–154:7, 156:21–157:4. Although Mr. Eaton was handcuffed and placed in the back of Officer Sanburn's vehicle, the evidence does not support a finding that Mr. Eaton was under arrest.

### *F. Consent to search*

Defendant argues that he did not validly consent to the search of the tent. Def.'s Mot. to Dismiss (Doc. 14) at 9–12. In his motion, he does not appear to contest his initial consent to allow Officer Sanburn to obtain his identification. *See id.* at 10.

It is well settled law "that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043-44, 36 L.Ed.2d 854 (1973). "[T]he Fourth and Fourteenth amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed." *Id.* at 228, 93 S.Ct. at 2048.

"Whether consent to search was voluntarily given is 'to be determined from the totality of all the circumstances.'" *United States v. Patayan Soriano*, 361 F.3d 494, 501 (9th Cir. 2004) (quoting *Schneckloth*, 412 U.S. at 222, 93 S.Ct. at 2041). "[F]ive factors are to be considered in determining the voluntariness of consent to a search[;]" however, these factors are guideposts, and should not be considered a checklist for the Court's review. *Patayan Soriano*, 361 F.3d at 502. The five factors are as follows: "(1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the defendant was notified that [he] had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained." *Patayan Soriano*, 361 F.3d at 502 (quoting *United States v. Jones*,

286 F.3d 1146, 1152 (9th Cir. 2002)). "The fact that some of these factors are not established does not automatically mean that consent was not voluntary." *United States v. Castillo*, 866 F.2d 1071, 1082 (9th Cir. 1988). The Government bears "the burden of proving that the consent was, in fact, freely and voluntarily given." *Bumper v. State of North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968).

Mr. Eaton was in custody, but not under arrest, and *Miranda* warnings had been given.[4] Hr'g Tr. 3/7/2019 (Doc. 31) at 16:23–17:6, 23:15–23, 90:3–91:6, 116:8–13. No guns had been drawn, but he had not been told he could consent. Also, Mr. Eaton was not told that a search warrant could be obtained. Defendant points to his age as a factor noting that "a reasonable child subjected to police questioning will sometimes feel pressured to submit when a reasonable adult would feel free to go." Def.'s Mot. to Dismiss (Doc. 14) at 10 (quoting *J.D.B. v. North Carolina*, 564 U.S. 261, 271 (2011)). Mr. Eaton was twenty-one (21) at the time of the incident, and although a young adult he was not a child. Hr'g Tr. 3/7/2019 (Doc. 31) at 124:3–6, 18–22. In fact, Mr. Eaton is a father. *See id.* at 137:5–20. The Court finds that Mr. Eaton's age is not a factor invalidating his consent. Mr. Eaton testified that Officer Sanburn asked him about marijuana in the tent prior to asking for his identification and giving *Miranda* warnings. *Id.* at 134:23–135:13. Officer Sanburn testified that prior to any discussion about marijuana, he asked Mr. Eaton for identification and then for permission to retrieve the identification when Mr. Eaton said that that his identification was inside the tent. *Id.* at 17:7–19:15, 83:12–17, 34:25–85:3. The Court finds Officer Sanburn's testimony credible. Even if, however, the Court accepts Mr. Eaton's testimony regarding the timing of their conversation as true, Mr. Eaton admitted that he consented to Officer Sanburn retrieving the jar of marijuana. *Id.* at 140:15–142:9, 148:24–150:10. Mr. Eaton testified that he did not feel like he could say "no" to Officer Sanburn, because the officer had already seen the marijuana. *Id.* at 138:4–25. Mr. Eaton's personal feeling of guilt, however, does not amount to coercion. Based upon the totality of the circumstances, the

---

[4] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Court finds that Mr. Eaton voluntarily consented to Officer Sanburn entering the tent.

### G. Scope of Consent

Mr. Eaton argues that he only gave consent to search the tent to retrieve the jar of marijuana and this should not be construed as *carte blanche* for Officer Sanburn to search the duffel bag. Def.'s Mot. to Dismiss (Doc. 14) at 12–13. In fact, Defendant maintains that he told Officer Sanburn that the baggie was not in the tent, but in his girlfriend's car. *Id.* at 14. Furthermore, according to Mr. Eaton, his duffel bag was *under* the blow-up mattress. *See* Hr'g Tr. 3/7/2019 (Doc. 31) at 137:5–20. The Government argues that the duffel bag, and the firearm in it, was in plain view. Govt.'s Response (Doc. 17) at 10–11.

Officer Sanburn testified that he saw the jar of marijuana in the tent when he went to retrieve Mr. Eaton's identification. Hr'g Tr. 3/7/2019 (Doc. 31) at 21:6–16, 87:1–88:10. Additionally, Mr. Castro admitted that there was marijuana in the tent and that the tent was owned by Mr. Eaton. *Id.* at 22:24–23:10. Mr. Eaton admitted that he had given consent for Officer Sanburn to enter the tent to retrieve the jar of marijuana. *Id.* at 140:15–142:9, 148:24–150:10. Officer Sanburn testified that as he scanned the tent, he saw an open blue duffel bag and saw two firearms inside. *Id.* at 25:16–26:12, 27:18–28:10. Officer Sanburn also testified that he had seen the open blue bag when he initially entered the tent to retrieve Mr. Eaton's identification and that it was next to the jar of marijuana. *Id.* at 55:21–56:2. Officer Sanburn testified that the bag was not covered at all, but he did not see what the bag contained until he returned to the tent to retrieve the jar of marijuana and look for the baggie of marijuana. Hr'g Tr. 3/7/2019 (Doc. 31) at 55:17–57:7, 88:11–89:19. Officer Sanburn explained that this was because initially he was in the "foyer" of the tent and not over the top of the duffel bag. *Id.* at 88:11–89:19. The Court finds Officer Sanburn's testimony credible. Officer Sanburn's testimony reflected that he was not looking for additional violations, but additional issues arose requiring his intervention. *See e.g., id.* at 23:15–23, 39:23–41:22, 90:3–91:6, 116:8–13 153:15–154:7, 156:21–157:4. Accordingly, the Court finds that Officer Sanburn did not exceed the scope of Mr. Eaton's consent, but even if he did, the duffel bag was in plain

view. *See Texas v. Brown*, 460 U.S. 730, at 737–40, 103 S.Ct. 1535, 1540–1542, 75 L.Ed.2d 502 (1983) (plurality opinion).

## III. CONCLUSION

The Court finds that based upon the totality of the circumstances, Defendant Eaton's consent was voluntary and Officer Sanburn did not exceed the scope of that consent. As such, Defendant's motion to suppress should be denied.

## IV. RECOMMENDATION

For the foregoing reasons, the Magistrate Judge recommends that the District Judge DENY Defendant Emmanuel James Philip Eaton's Motion to Suppress Evidence (Doc. 14).

Pursuant to 28 U.S.C. §636(b) and Rule 59(b)(2) of the Federal Rules of Criminal Procedure, any party may serve and file written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. No reply shall be filed unless leave is granted from the District Court. If objections are filed, the parties should use the following case number: **CR-18-01795-TUC-JGZ**.

Failure to file timely objections to any factual or legal determination of the Magistrate Judge in accordance with Fed. R. Crim. P. 59 may result in waiver of the right of review.

Dated this 15th day of May, 2019.

Honorable Bruce G. Macdonald
United States Magistrate Judge